BUENA VISTA HOMES, INC., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 6201.

United States Court of Appeals
Tenth Circuit.

June 15, 1960.

T. B. Keleher, Albuquerque, N. M., and William Duncan, El Paso, Tex. (Eugene R. Smith, El Paso, Tex., and W. A. Keleher, Albuquerque, N. M., were with them on the brief), for appellant.

Harold S. Harrison, Atty., Dept. of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., James A. Borland, U. S. Atty., D. New Mexico, Albuquerque, N. M., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., were with him on the brief), for appellee.

Before PICKETT and BREITEN-STEIN, Circuit Judges, and SAVAGE, District Judge.

BREITENSTEIN, Circuit Judge.

The United States brought action to condemn a Wherry Act housing project and commissioners awarded $385,000 as just compensation to appellant, Buena Vista Homes, Inc. The appeal is from the judgment on that award. The issues relate to the instructions, the proper method of handling a reserve fund in determining value, and the adequacy of the award.

With the objective of providing low-cost military housing, built by private enterprise through the medium of Government-insured mortgages, Congress passed the Wherry Act of August 8, 1949.[1] Inducements to private builders included Government insurance of 90% of mortgages and elimination of land acquisition costs by the leasing of Government-owned military sites, free from the right of revocation, at nominal rentals. Those entering upon such a project were required to form a corporation with a charter as prescribed by the Federal Housing Administration. Because of the purpose of the act, to provide housing at rentals military personnel could afford to pay, and because of the high percentage of the cost insured by the Federal Government, the mortgagors were subject to regulations in such matters as rents, charges, capital structure, rate of return, and methods of operation.

Under authorization of agreements made pursuant to the Wherry Act, Buena Vista constructed 235 rental units with

necessary service structures on 48 acres of leased Government land at the White Sands Proving Grounds in New Mexico. Site improvements such as streets, curbs, and utility lines were constructed by the United States out of appropriated funds and were not a part of the Buena Vista operations. The lease from the Government was for a term of 75 years[2] at an annual rental of $100. The rental units were completed in June, 1953, at a cost in excess of $2,000,000. The original principal amount of the mortgage given to the New York Life Insurance Company was $2,043,600.

The Act of August 7, 1956,[3] known as the Capehart Act, made mandatory the acquisition by the United States of Wherry Act projects located at military installations where Capehart housing was approved. Such housing was approved at White Sands, New Mexico. The United States instituted condemnation proceedings, filed a declaration of taking, deposited $225,000 as estimated compensation, and took possession on January 2, 1958. As of the date of taking the unpaid principal balance due on the mortgage was $1,922,757.

Objection is made to Instruction No. 8 upon the ground that it eliminated from consideration the reproduction cost less depreciation method of valuation.[4] In this instruction, the court said that reasonable market value was to be determined by methods which are, in order of importance; first, comparable sales, and, second, capitalization of income. No issue is raised as to the propriety of either of these methods.

---

1. 63 Stat. 570; 12 U.S.C.A. § 1748 (1952).

2. The lease expired November 9, 2027.

3. 70 Stat. 1111, 42 U.S.C.A. § 1594a(b).

4. The attacked instruction reads: "You are instructed that just compensation for the defendant's interests as lessee is the reasonable market value of the rights condemned. Reasonable market value is generally determined by several methods, which in order of importance are the following: 1. Market data; determined by comparison with actual comparable sales of like property prior to January 2, 1958. 2. Income method; determined by considering the net income obtainable within the terms of defendant's lease and mortgage provisions, and considering all the limitations thereon, together with the risks of all the various circumstances, including appropriate allowances for replacement and restoration of the leased premises. You may use any or all of such methods in reaching your determination of reasonable market value."

■ The applicability of the reproduction cost less depreciation method of valuation in a condemnation proceeding involving a Wherry Act project was considered at length by the Fifth Circuit in the case of United States v. Benning Housing Corporation, 276 F.2d 248. The conclusion was reached that it was not a proper basis of valuation because the condemnee's rights with respect to the property were limited by the fact that the projects were subject to rent control by Federal Housing Administration and the consistent policy in regard to such projects had been the allowance of a return based on original cost rather than reproduction cost. We agree and can add nothing to the analysis made in that decision. Here, as there, the conclusion is supported by the absence in the record of any unequivocal evidence that the project would be reproduced by private investors at the risk of private capital.

■ Instruction No. 9 told the commissioners that the January 2, 1958, rent schedule was the basis of the rental income of Buena Vista.[5] Buena Vista urges that the instruction was erroneous because it did not tell the commission that the rental income could be adjusted by appropriate action. Reliance is placed on the provision of the Wherry Act[6] which states that the commissioner may, in his discretion, require the mortgagor to be regulated as to rents. This discretionary power was exercised and the mortgagor was forbidden to impose charges in excess of an approved rental schedule.[7] In any event, the important aspect of federal control was the control over rate of return, which in this instance was fixed at 6.5%. Flexibility in rents permitted adjustments relating to operation, maintenance and like matters. It did not permit an increase in rate of return. The record shows that this factor was understood by witnesses and commissioners alike. The objections are not well taken.

The mortgage given by Buena Vista to New York Life Insurance Company required that the mortgagor, Buena Vista, pay to the mortgagee, New York, a specific monthly sum which the mortgagee would hold as a reserve for replacements. The purpose of the reserve was to assure that Buena Vista would make the necessary repairs and replacements. Actually the required maintenance was performed by Buena Vista without touching the reserve fund. The Capehart Act authorized the release by agreement of funds set up as reserve for replacement[8] and pursuant to such an agreement the reserve fund now under consideration was returned to Buena Vista.

Instruction No. 15 was given to the commissioners over the objection of Buena Vista. Therein, the court stated that as the reserve fund was returnable to Buena Vista "it should be deducted from the amount you find to be the reasonable market value of defendant lessee's [Buena Vista's] interest in the Wherry Housing Project."

This reserve fund was treated in various ways by witnesses who appeared before the commissioners. Three witnesses arrived at estimates of fair market value from which the reserve fund, under their calculations, should be deducted. Two witnesses made their appraisals upon a basis to which the amount of the reserve fund should be added. One wit-

---

5. The instruction read: "The rentals which defendant could charge tenants in the Wherry Housing Project were subject to control by the Federal Housing Administration under the laws of the United States including rules and regulations of the Federal Housing Administration, and you are therefore instructed that the schedule of rentals in effect as of January 2, 1958, as actually approved by the Federal Housing Administration must be considered by you as defendant's basis of rental income."

6. 63 Stat. 572; 12 U.S.C.A. § 1748b(b)(1).

7. Cf. Loftus v. Mason, 4 Cir., 240 F.2d 428, 431–432, certiorari denied Shirley-Duke Apartments, Section 1, Inc. v. Mason, 353 U.S. 949, 77 S.Ct. 860, 1 L.Ed. 2d 858. See 14 Fed.Reg. 5266, § 292.32.

8. 70 Stat. 1112; 42 U.S.C.A. § 1594a(e).

ness made no adjustment because of the reserve fund. A witness for the Government testified that the fund was tied to the property and not to the owners. A witness for Buena Vista disagreed, saying that the fund belonged to Buena Vista. The matter was further complicated by the fact that, at the time of taking, the property required repairs costing $75,000 to $100,000 to put it in good condition. The confusion and disagreement over the method in which the reserve fund should be treated could be further amplified but no good purpose would be served by so doing. The issue must be determined by reference to the findings and conclusions of the commission.

The commission, in its report, stated that in determining value "paramount consideration should be given to capitalization of income approach," and concluded its findings with this:

"* * * the fair market value of Defendant's leasehold interest as of January 1, 1958, is $440,000.00, less replacement reserve fund heretofore received by Defendant in the sum of $56,667.62, making a net to be received by the Defendant in the sum of $383,332.38."

Both parties filed objections to this report. At the request of the court the commission reviewed its action and submitted a supplemental report. Therein it is stated that the value was based on the capitalization of income method and that:

"* * * the value of $440,000.00 was and is our finding of the fair and reasonable market value at the time of taking, and pursuant to the Court's instruction No. 15 there is to be deducted therefrom the amount of the reserve fund."

Thereafter, the court entered an order in which it was recited that Instruction No. 15 was erroneous and that the court desired "the decision of the Commissioners without any regard to the reserve fund and with full knowledge that it will not be deducted from the value determined by them." The court ordered:

"That the Commissioners now advise the Court whether their valuation of $440,000.00 remains unchanged or do they desire to change or modify it in any way in the light of the Court's withdrawal of the instruction that the reserve fund would be deducted from the value determined by the Commissioners.

"The Commissioners will now indicate their opinion as to the fair market value of the property condemned and submit the same to the Court as soon as possible."

The commissioners then filed a second supplemental report in which they said that the reserve fund was taken into account in their original report, that the property needed repairs and replacements costing between $75,000 and $100,000, that this was considered in connection with the reserve fund, and that "as the record now stands [after the withdrawal of Instruction No. 15 relating to the reserve fund] there is a complete void in considering the cost of repairs and replacements which we did consider in our original report." Following these statements, the commissioners said:

"After a full reconsideration of the matter under the present instructions, we find the fair market value of defendants' leasehold interest as of the date of taking is $385,-000.00."

The court accepted this report and entered judgment for $385,000. Buena Vista contends that as the commissioners twice found the fair market value to be $440,000, from which should be deducted the reserve fund, the elimination of the reserve fund requires that the $440,000 figure must be taken as the fair market value. The argument is not persuasive.

■ Buena Vista is entitled to recover the fair market value of the property. The commission adopted the capitalization of income method for the determination of value. This method of valuation contemplates that the property is in good condition and capable of producing the

income to be capitalized. If, in fact, the property is not in good condition, proper allowance must be made for the cost of needed repairs and replacements. The reserve fund was created to establish and accrue a fund from which the cost of repairs and replacements could be paid.

If such fund were available to the condemnor to make such payments, the value arrived at by capitalization of income would have to be adjusted by the deduction of the repair and replacement cost and the addition of the amount of the reserve fund, or by the deduction of the amount of the reserve fund from the repair and replacement cost and the deduction of the remainder from the capitalization of income figure. The end result is the same in either event when, as here, the cost of the needed repairs and replacements exceeded the reserve fund.

In fact, the fund was not available to the condemnor as it had been returned to Buena Vista. Accordingly, the entire repair and replacement cost had to be deducted from the capitalization of income figure to arrive at the fair market value. That is what the commission did in its second supplemental report.

Another way of stating the problem is that the original instruction considered the reserve fund as tied to the property and hence an item which required consideration in the determination of value, but as the amount of the reserve fund had been paid to Buena Vista that amount would have to be deducted in order to determine the amount of judgment to which Buena Vista was entitled. When that instruction was withdrawn and the commission was told not to deduct the amount of the reserve fund, the court told the commission, in effect, that the reserve fund was not tied to the property and was not a factor in the determination of value. This change in the ground rules threw out of adjustment the figures used by the commission in its previous reports. If the commission then included within the value the amount of the reserve fund, which had already been paid to Buena Vista, a double payment would have resulted in the amount of that fund.

It is apparent that the commission had full realization of the effect of the change in instructions. After full reconsideration of the entire matter, it fixed the fair market value at $385,000. Such conclusion is not inconsistent with the previous actions taken by the commission. The objections of Buena Vista with regard to the treatment and effect of the reserve fund are without merit.

The award is attacked as inadequate. Eight witnesses testified as to value and, without getting into the reserve fund complications, their appraisals ranged from about $225,000 to about $900,000. The award of $385,000 is well within the range of the testimony. This court will not assume the function of retrying the facts.[9] A finding based on sharply conflicting evidence is conclusively binding here.[10] In the case at bar there is substantial evidence of value both lower and higher than that fixed by the commission. We may not re-weigh that evidence in a de novo review or reverse because the commission adopted a value nearer that of the Government experts than that of the appraisers for Buena Vista.[11] In United States v. Waymire, 10 Cir., 202 F.2d 550, 553, this court said that the findings of a commission in a condemnation case shall be accepted unless they are clearly erroneous. As a review of the record in this case convinces us that there is substantial evidence to sustain the findings and that the commission did not make a mistake, its award and the judgment based thereon must stand.

Affirmed.

9. Barnard-Curtiss Company v. United States, 10 Cir., 244 F.2d 565, 567.

10. Hopkins v. McClure, 10 Cir., 148 F.2d 67, 70.

11. Stephens v. United States, 5 Cir., 235 F.2d 467, 471.